# DOYLE *v.* McROBERTS.

PATENTS; INTERFERENCES; PRIORITY; PATENTABILITY; APPEL-
LATE PRACTICE.

1. When one of the parties to an interference has received a patent,
this on its face affords *prima facie* evidence that he is the in-
ventor and that the thing patented is a novelty, and the paten-
tee will not be defeated of his rights under the grant unless
the applicant shall establish the priority of his invention beyond
a reasonable doubt, and shall also show diligence in reduction
to practice, especially where the question of priority has been
passed upon in the same way by the various officials of the
office; *following* Hisey *v.* Peters, 6 App. D. C. 68.
2. Where the testimony in an interference proceeding between an
applicant and a patentee shows that the former was present
on one of the first occasions upon which the invention which
is the subject of the issue was tested ; that he ridiculed the
attempt as impossible of execution and dangerous to attempt;
that the applicant did not claim credit for the invention when
he was first accustomed to hear it attributed to the patentee;
that the application was filed after the issue of the patent and
is a substantial copy thereof, and where there are other and
corroborating circumstances, the presumption that the pat-
entee is the prior inventor has not been disturbed.
3. A motion by the junior and defeated party to an interference to
dismiss an appeal to this court upon the ground that there is
no invention in the patent-right claimed is at variance with
the oaths in the application and the preliminary statement.
4. It is not competent for this court, in an interference proceeding,
to abandon the question of priority and pass upon the patenta-
bility of the alleged invention.
5. An appeal to this court in an interference case is not a proceeding
in equity, and the provisions of Revised Statutes, Section 4915,
do not apply. It is a proceeding at law, and hence a decision
of the Supreme Court of the United States as to the statute
referred to does not apply in this case.

No. 41. Patent Appeals. Submitted March 9, 1896. Decided April 6, 1897.

HEARING on an appeal from a decision of the Commis-
sioner of Patents in an interference proceeding. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Messrs. Knight Bros.* and *Mr. E. M. Marble* for the appellant.

*Mr. Paul Bakewell* and *Messrs. Pennie & Goldsborough* for the appellee.

Mr. Justice HAGNER, of the Supreme Court of the District of Columbia, who sat with the Court in the hearing of the cause in the place of Mr. Chief Justice ALVEY, delivered the opinion of the Court:

On the 8th day of July, 1893, James G. McRoberts, of St. Louis, Mo., filed an application for a patent on "an invention in the art of steel founding," supported by his affidavit of July 6 in the usual form.

His claims as set out in the application were:

"1. The herein-described improvement in the art of steelfounding, the same consisting in introducing the steel through a dry-sand gate and forming the casting in a wetsand mold, as set forth.

"2. The herein-described improvement in the art of founding steel, the same consisting in introducing the steel through a dry-sand gate into and throughout a green-sand mold, and so that the heat of the molten steel shall skindry the mold-walls in advance of the progress of the metal through the mold."

The object of the improvement claimed was thus stated by McRoberts in the specification forming part of the patent:

"Between steel-founding and ordinary iron-founding this important difference exists in practice: About twice as much heat is required in steel-founding as in iron-founding, and in consequence shrinkage-strains to a corresponding degree have to be provided for. Furthermore, in view of the excessive heat referred to, it has been the practice to employ dry-sand molds exclusively. The steam and gases created by the highly-heated steel in casting it are generated so rapidly and profusely as to hitherto preclude the use of

green-sand molds. But in the employment of dry-sand molds this difficulty is encountered: the parts of a dry-sand mold are incapable of yielding, or yielding sufficiently, to the steel as it contracts in cooling, and in consequence of this many forms cannot be cast. For instance, a structure of a U-shape in cross section cannot be made satisfactorily; for the various sides in cooling draw toward each other and, meeting the resistive dry sand, are liable to, and frequently do, check and crack. Any form also having a shoulder projecting in a direction more or less crosswise to that in which the shrinkage occurs is liable to rupture at or in the vicinity of the shoulder. As shapes such as referred to represent a large class of structures which it "is desirable to form out of steel, it is apparent that as the art of steel-founding now exists the use of cast steel is materially limited. Moreover, the expense of steel-founding is considerably increased in having to use dry-sand molds.

" To prevent the checking and rupturing referred to it has been customary to reinforce the casting at the points therein where the shrinkage-strains have to be met, by forming upon the castings, fins, brackets and projections variously shaped according to the particular shape of casting being made. The integrity of the casting in this manner can often be preserved, but the reinforce in question has to be removed from the casting after it has been made. Owing to the extreme toughness of the steel the removal is an expensive operation—so expensive as to frequently make it undesirable to make the casting.

" The improvement under consideration possesses several advantages, some of which are as follows: Wooden instead of iron flasks can be used; drying-ovens, as well as the means for transferring the flasks to and from the ovens, are dispensed with, and the cost of operating the ovens obviated; that space upon the foundry floor which is required for carriages for the dry sand molds is saved for other purposes; but a single handling of the mold after it is made is

required; the proportion of castings lost by checking is largely, if not entirely, diminished; and the loss arising from falling out due to excessive handling is prevented; the reinforces are no longer needed except in quite exceptional instances, and the time employed in molding them in is saved; the loss arising from the burning and destruction of molds in the drying oven, something liable to occur, is prevented, and the cost of drying the mold is avoided; but further, and more especially, the improvement is desirable in that it greatly extends the use of cast steel, and in that it materially cheapens the operation of steel-founding.

" The invention consists partly in the improved method of casting the steel, and partly in the apparatus employed in carrying out the method, all substantially as is hereinafter set forth and claimed, aided by the annexed drawings, making part of this specification.

.    .    .    .    .    .    .

" In using the terms 'dry sand' and 'wet sand' I desire not to be restricted to sand specifically, but wish it understood that any suitable equivalents may be substituted therefor respectively; that is, in the one case, refractory material suitable for making a gate through which molten steel can be poured downward without abrading the gate, or generating steam to cause what is termed explosion in the metal, and, in the other case, material suitable for forming a mold of the yielding nature described, may be used."

On the 5th of September, 1893, the patent was issued to McRoberts, No. 504,361.

On the 21st of October, 1893, Louis Doyle, also of St. Louis, filed in the office an application in which, supported by the usual oath, he claimed to have invented a new and useful improvement in steel-founding, of which he proceeded to give " a full, clear, and exact description," the important part of which is as follows:

" It has been the common practice for many years, in iron-founding, to use green sand, both for the mold proper

and for the gate or runner, and it has likewise been the practice for many years in steel-founding to use dry sand, both for the mold proper and for the runner or gate.

"A belief has existed that, owing to the high temperature to which steel must be heated before casting, a green-sand mold would be impracticable and dangerous on account of liability of explosions, while with iron which is not heated to such a high temperature these difficulties would not be encountered.

"There are objections to the use of a dry-sand mold in steel-founding, as, for instance, the unequal shrinking and the checking of the casting, due to the rigidity or inflexibility of such a mold, and which do not exist in a green-sand mold, which is quite flexible and yielding. Owing to the rigid and inflexible character of a dry-sand mold, many articles have not been made of steel which otherwise would have been made of steel; and articles which have been made of steel, have been reinforced at the points subject to the greatest strain in cooling in a rigid dry-sand mold, such reinforcements being unnecessary, except to prevent warping and cracking of the casting.

"Accompanying the use of dry-sand molds there are items of expense which do not exist, or which do not accompany the use of green-sand molds, which are well known to the art, such, for instance, as the use of drying-ovens, machinery for transferring the flasks to and from the ovens, etc.

" My invention consists partly in an improved method for casting steel and partly in an improved apparatus for carrying out the method, and which will be explained in connection with the accompanying drawings.

" It will be understood that in using the terms 'dry sand' and 'green sand' I do not desire to be limited to sand alone, but to such equivalents of each as will serve the purpose of preventing the generation of steam and gas in the gate and affording the yielding character of the mold."

His claim is thus stated:

"I claim as my invention—

"1. The herein-described improvement in the art of steel-founding, the same consisting in introducing steel through a dry-sand gate and forming the casting in a green-sand mold, as set forth.

"2. The herein-described improvement in the art of steel-founding, the same consisting in introducing the steel vertically and then horizontally through a dry-sand gate and forming the casting in a green-sand mold, as set forth.

"3. The improvement in steel-founding herein shown and described, consisting of a green-sand mold and a dry-sand gate, substantially as set forth.

"4. The improvement in steel-founding herein shown and described, consisting of a green-sand mold and a dry-sand gate, said gate having a vertical portion and horizontal sprues, substantially as set forth.

"5. The herein-described improvement in the art of steel-founding, the same consisting in introducing the steel through a dry-sand gate into and through a green mold, and so that the heat of the molten steel shall skin-dry the mold-walls in advance of the progress of the metal through the mold."

All these claims were rejected by the Patent Office on the 19th of December, 1893, as in conflict with McRoberts' patent, No. 504,361; and on the 12th of January, 1894, the application was placed in interference at the request of Doyle and his counsel.

The testimony of twenty-two witnesses on behalf of Doyle and of thirty-three on behalf of McRoberts occupies some eight hundred printed pages of the record. The drawings are very numerous; the briefs of counsel cover some two hundred and twenty printed pages, and the wooden and metal models filed as exhibits would fill a moderate-sized horse cart.

On the 27th of November, 1894, the Examiner of Inter-

ferences filed his opinion, rendering judgment of priority of invention in favor of McRoberts. From this an appeal was taken to the Board of Examiners-in-Chief, which affirmed the judgment on January 8, 1895. An appeal was taken to the Commissioner of Patents, and on the 7th of August, 1895, the ruling of the Board of Examiners was affirmed. From this judgment the appeal comes to this court.

We have had the benefit of these careful decisions and of the able arguments of the counsel, displaying diligence and ability, and the record has been carefully examined.

As between the parties to the present controversy, McRoberts only has received a patent; and this on its face affords *prima facie* evidence that he is the inventor and that the thing patented is a novelty; and the patentee will not be defeated of his rights under the grant unless the applicant shall establish the priority of his invention beyond a reasonable doubt and shall also show diligence in reducing his invention to practice, especially where the question of priority of invention has been passed upon in the same way by the various officials of the Patent Office. *Hisey* v. *Peters*, 6 App. D. C. 68; *Smith* v. *Goodyear*, 93 U. S. 486; *Cantrell* v. *Wallick*, 117 U. S. 695; *Morgan* v. *Daniels*, 153 U. S. 123.

We shall not attempt a detailed examination of the great mass of testimony with which this record is filled. This has been done in different methods by each of the three tribunals of the Patent Office, which have in turn agreed in the rejection of Doyle's claims. The result of the whole testimony, as we find, establishes the correctness of McRoberts' application, preliminary statement, and affidavits.

The evidence shows that in 1891 McRoberts was superintendent of the works of the St. Louis Steel Foundry Company, which was situated at the east end of the bridge across the Missouri river. The castings made under his superintendence were run into molds made of dry sand. After all the molds which were ready had been filled from the ladle the workmen were accustomed to pour the surplus

steel upon the floor, to be thrown again into the furnace and remelted for future use. During the last part of the year this surplus had accumulated so much as to be greatly in the way, and its presence was objectionable for other reasons. The furnace, which had been shut down during the holidays, was reopened January 20, 1892. McRoberts then determined to cast this surplus steel from day to day into the form of ingots, in molds made of dry sand, and this plan was regularly followed. One day during the month of February, 1892, he was informed there was no mold ready for the surplus steel. as the dry sand on hand was all in use in the castings already made. McRoberts therefore ordered a mold to be made of green or wet sand. When this was ready for use one of the workmen, Wiedmann, an intelligent German, knowing the risk of pouring hot steel into wet molds, remonstrated with McRoberts, telling him some one would be killed if the directions were carried out. McRoberts then told Wiedmann to throw dry sand over the green sand at the bottom of the mold, and it was compacted against the wet sand. The workmen objected to assist in pouring the steel from the ladle, and McRoberts himself made the pouring or assisted in doing so. The result was entirely satisfactory. A good casting of a perfectly good ingot was made, unattended by any accident. This first experiment was made about the middle or last of February, 1892. The correctness of this date is satisfactorily proved by several witnesses, as well as by circumstances established in the case.

The workmen named by McRoberts as among those present when this ingot was cast sustain his statement in every important particular. The testimony of Wiedmann, Allison, Gribben, Starkes and Goltra show that McRoberts, after the ingot casting had proved successful, claimed to them in different forms of positiveness that he could make castings in green-sand molds after the method pursued in casting the ingots.

· McRoberts' own statement is that he believed he had discovered from that experiment that the heat of the molten steel flowing into the mold, "skin-dried the surface of the mold-wall at a point more or less distant from the position of the metal, and sufficiently to enable the steel, when brought in contact with such dried surfaces, to lie quietly against it."

He explains that the idea at that time was not carried any farther than the casting of the ingots, although he would have proceeded farther, because he was forbidden by the manager, Goltra, who said that even if he should produce castings in that manner they would have no commercial value, as they would be unsound or full of blow-holes; that "upon the casting of the ingot he discovered that steel, properly introduced into a green-sand mold, would lie against the wall; and knowing from experience that it could be introduced through a dry-sand gate, as he was then doing, he was very well aware that all that was necessary to carry this out was the coupling of a dry-sand gate or runner with a green-sand mold."

This evinces a clear and definite idea in his mind of the application of a principle evolved from the success of the ingot experiment.

Nothing further appears to have been done in this direction beyond the casting of the ingots, sometimes in dry and sometimes in green sand, until the destruction of the St. Louis Steel Foundry Works in May, 1892. The wreck of this plant was purchased by the Shickle, Harrison & Howard Iron Company, of St. Louis, and removed to their place of business in St. Louis. McRoberts entered into the service of the Shickle-Harrison Iron Co., which up to that time had never been engaged in casting steel. After the company had determined to adopt that form of industry McRoberts was assigned as practical superintendent of the steel-castings, although, as he says, he received no such title, notwithstanding it appears he was placed on a salary

instead of receiving wages, as was usual with subordinate employees. His application of the principle of his new idea until November following at the Shickle Company works was limited to the casting of the steel ingots, from time to time, as the occasion required.

About the 15th of October, 1892, an attempt was made at the company's works, by Doyle, Gallagher and Meyers, to cast a frame in a green-sand mold with a green-sand gate, which was a failure, as was a similar attempt a few days later. The pattern being a peculiar one, the attempt also failed when the steel was poured in a mold entirely of dry sand, and two or three weeks later the use of steel was abandoned and the casting was made in bronze. No attempt was made at the time to use a dry-sand gate with a green mold. About the 18th of November Gallagher gave to McRoberts an urgent order from one Fritz to make twenty-four steel castings of truck-wheels. As these were also of a peculiar shape, McRoberts told Gallagher he did not believe they could make them in the old manner, in dry sand, but directed Clifford to make the molds. Nine or ten were cast the next day, but they pulled apart by reason of the shrinkage of the steel on the mold, and for several days renewed efforts were made, with similar failures for the most part. On the 29th, after every effort had been made to cast them in dry sand, McRoberts determined to try the green sand after the plan adopted for casting the ingots, and directed Clifford how to make a mold that would present these features. Meeting Doyle, he told him what he intended to do. Doyle laughed at the idea and said it could not be accomplished, but that he might try it if he wanted to do so. McRoberts testified:

"When the molds were brought down onto the casting-floor, I gave the men particular orders to look after them carefully, as I was very anxious about the success. I not only told the men who handled them, but both the men

who had charge of the dry floor, to wit, William Wiedmann
and Robert H. Allison.   Soon after the molds came down
and we were about ready to tap the furnace, the ladleman,.
Charles Hutchison, whose duty it was to pour the steel into
the mold, came to me and said that he wouldn't pour them;
that he had worked in different steel foundries and that if
steel was attempted to be poured into a green-sand mold it
would cause an explosion, and he reported it to the men on
the furnace, who had had a long experience in the steel-
casting business, and it created quite a commotion, and
when we came to pour them, everyone who could, got as far
away from the mold or molds as possible; and I remember
distinctly that Mr. Louis Doyle and Mr. John W. Harrison
stood on the opposite side of the foundry, thirty or forty
feet away, laughing and, to my mind, poking fun at what
they expected would turn out an explosion and a failure.
On the contrary, when the steel was poured into these
moulds they filled up and lay as quiet as any dry-sand
mould that I had ever seen poured, and when they were
shaken out they were found to be a perfect casting in every
particular.   On the next morning, or the next day, I should
say, we made four others in exactly the same manner, and
they turned out the same—that is, perfect in every particu-
lar—thus filling the order for twenty-four of these truck-
wheels."

All the witnesses agree that McRoberts took the place at
the ladle of the man who had objected to pour the steel.

McRoberts named thirteen persons who were present at
this casting, eight of whom, when called by McRoberts,
sustained him throughout.   Three who were called by
Doyle (one being Doyle himself) sustain McRoberts in
important particulars.   One of them, Charles Hutchison,
testified that the workmen present after the casting was
made talked in praise of McRoberts, saying he "was a
dandy, making them things in green sand; making that

business in green sand, when it had been cracking in dry sand;" and to the same effect was the spontaneous utterance of almost every workman present.

John W. Harrison, vice president of the Shickle, Harrison & Howard Co. (pecuniarily interested on behalf of Doyle, and who was called by Doyle), testified that at the time this casting was about to be made in a green-sand mold with a dry-sand gate, "Mr. Goltra came into the office in a very excited manner, and in the presence of Mr. Howard and myself urged me to go to the foundry immediately, and I think his language was, 'Those damn fools out there are going to attempt to pour steel into a green-sand mold, and somebody is likely to be killed.' I immediately got up and went out into the foundry, and I think both Gallagher and Doyle were present when I spoke to them. I simply asked the question if they were going to pour a green-sand mold. They stated they were, and I simply stayed there and saw it done. No further remark between themselves was made in regard to it."

Although he declares he felt no apprehension of danger from the casting, when asked how near he stood, he answered: "Well, I can't state how near I was; possibly within fifteen or twenty feet. There is always a splash of steel in pouring these molds, and I always keep far enough away to keep from getting my clothes burned."

We have not the time to quote from the testimony of the witnesses at large on this subject, but will refer to that of H. E. Tuttle, an intelligent witness for McRoberts, who is shown to be a son of the bishop of that name, a graduate of Columbia College, New York City, who had previously been employed at the Bessemer Works in Birmingham, and who was then at the Shickle-Harrison Company's works studying to perfect himself in the art of steel-founding. He states very positively that McRoberts was in charge of the steel-molding department and that he, and not Doyle, gave all the orders to the molders; that there had previously been repeated

failures in making some forms of castings in dry sand; that the greater number of the molds had proved useless on account of the checking in the dry sand, and that the change to green sand stopped the checking almost entirely; that "the feeling throughout the shop among the molders was that the credit of the change was due to McRoberts; that they seemed to give McRoberts all the credit for it; indeed, until this case came up, I never heard any one else lay claim to the idea. I heard no one dissent"—they did not have to say whether they considered it a valuable invention—"it was proving itself to be by the work it was doing, but the impression among us was that it was a most valuable idea;" that he never heard Mr. Doyle claim any credit in connection with this method of casting, and "never heard any such claims either from him or from hearsay around the shop."

It is abundantly proved that the invention was in use in the Shickle, Harrison & Howard Iron Company's works from December, 1892, up to McRoberts' application for a patent in July, 1893, and is still extensively used.

On October 21, 1893, Doyle filed his application, which on comparison will appear closely imitated, and in many particulars copied from that of McRoberts, which had then been on file in the Patent Office since the preceding July. It even repeats the disclaimer of McRoberts of a claim that sand is the only substance proper to be used. Though claiming therein to have been the inventor of the described method of casting steel, the proof is satisfactory that repeatedly since February, 1892, and before he filed his application, Doyle had heard McRoberts claim the invention as his own, and had heard others ascribe the credit of the invention to McRoberts without asserting any claim by himself as inventor. A number of witnesses proved the presence of Doyle at the casting of the truck-wheels by McRoberts, and that he was standing some distance off and laughing at the attempt. Starkes swears that when McRoberts told Doyle he

was going to try to cast wheels in green sand Doyle replied "it could not be done," and that after its success "everybody gave McRoberts praise." Goltra testifies that after examining the draw-bar cast by the new method he asked, in presence and hearing of both Doyle and McRoberts, "Whose scheme is this?" and that McRoberts quickly replied that he had gotten it up, without a word of denial by Doyle. Starkes swears that when McRoberts told Doyle he was going to try steel casting in green sand, as they could not get a good one in dry sand, Doyle "answered something about hell—that he did not believe he could do it;" and when McRoberts replied he was going to try it anyhow, Doyle said it would not be worth a damn. "McRoberts said all he wanted was a show." Mr. Doyle said he could have all the damned show he wanted; and Mr. Hutchins testifies to hearing the same remark made by Doyle.

In Doyle's preliminary statement on the interference he declares that "he conceived the invention about the middle of the month of February, 1892," (about half a month before the date assigned by McRoberts as the date of his conception of the idea). At the date thus fixed by Doyle, he was working at the Shickle, Harrison & Howard Iron Company, which up to that time never had attempted any casting in steel, and Doyle, until November, 1892, had no experience in steel casting. At that date McRoberts was still employed at the St. Louis Steel Company Works, where he had been acting since November, 1891, as the superintendent of steel casting. What Doyle meant by his statement that "he conceived the invention" about the middle of February is explained by him.

"20 Int. On what occasion did this thought occur to you, and how do you fix the date?—A. It occurred to me by Mr. John W. Harrison, after we had transacted some private business of the Howard, Harrison Iron Company, by him stating that we would have to get into the manufacture of

steel in our shop, which, referring to the documents of that time, was close to February of the same year I stated.

"25 Int. At this conversation with Mr. Harrison, did you refer or speak to him about casting steel in a green-sand mold with a dry-sand runner?—A. No, not on that occasion."

There is no proof that Doyle ever mentioned "the thought that occurred to him by Mr. Harrison" to that gentleman; nor is there any proof he confided it to any one else. In the preliminary statement he speaks of the first explanation he ever made of the invention to any one, as follows:

"26 Int. Now how soon after this time did you speak to any one about casting steel in a green-sand mold with a dry-sand runner?—A. I went to East St. Louis on the invitation of Mr. Gallagher, on St. Patrick's Day, to the works of the St. Louis Steel Foundry Company, inspected that place, returning from there I had some conversation with Mr. Gallagher in regard to it a day or two afterward with Mr. Howard.

"27 Int. This was St. Patrick's Day of what year?—A. 1892.

"28 Int. What did you say to Mr. Gallagher at this time?— A. I talked in a general way about the molding.

"29 Int. What did you say to him about the subject-matter of this controversy?—A. We talked about the way to make those various castings by introducing steel into the dry-sand runner with a green-sand mold."

These answers, in reply to questions that naturally were excepted to as leading, are very unsatisfactory explanations of the alleged invention.

On cross-examination he is pressed to disclose precisely what he really said to Gallagher and Howard by way of explanation:

"288 X-Int. You have spoken of a conversation which you had with Mr. Gallagher, in reference to casting in green sand, prior to the date of first casting steel in your works.

What was that conversation?—A. Some of it was relating to the conditions of metal in sand, and the conditions of the sands.

"289 X-Int. Tell me what you said, and what he said, and the language as near as you can.—A. If anything more than that, in a general way of the conditions of the metal and the sand, the condition of putting it together, get it perforated near enough to the wall, even if it is too wet, under favorable conditions you can get metal to lay up to it tolerably well. Talked about a pig-bed, and the mode and manner of making it, and the conditions, and the quality of the sand.

"290 X-Int. State what your conversation was with Mr. Howard, with reference to casting in steel, which you have already referred to; give what you said and what he said as near as you can.—A. Well what I said, intended to say, related principally to the lack of knowledge of the parties he had engaged in casting steel.

"291 X-Int. Well, state what you said. — A. I have stated it.

"292 X-Int. What you have stated is what you said as near as you can come to it?—A. Yes, that is about the substance of it."

Gallagher testified there was some talk with Doyle after he had visited the St. Louis Steel Works on St. Patrick's Day, 1892.

"14 Int. Please state the substance of it as nearly as you can.—A. Well, Mr. Doyle said to me that they were making a good deal of fuss about making steel castings over there. He said that he didn't see why steel couldn't be cast just as easy as iron; saw no reason why he couldn't make steel lay on a mold just the same as iron.

"19 Int. When Mr. Doyle made the remark that he didn't see why you could not cast steel in the same way that iron was cast, what way did he refer to?—A. He went on to tell me that it was necessary to provide a hard sub-

stance in the shape of a dried part for the metal to enter the mold; my recollection of it.

"20 Int. What did he say about the mold itself?—A. We were talking about green-sand molds.

"21 Int. Do you remember anything further that he said at that time on that subject?—A. Our principal conversation was in reference to molding, almost entirely.

"22 Int. Now what was the substance of Mr. Doyle's statement to you, on that day, as to casting steel; in what kind of a mold and what kind of a runner?—A. A green-sand mold and a dry-sand runner was the substance of it."

Howard was examined to prove the explanation given at the time by Doyle.

He says Doyle had a long conversation with him a short time after the visit; that "the substance of the conversation was right in his line of business, about making the castings and the cost of making them; said they were making a great to-do about what we considered a simple thing to accomplish; and he thought the matter might be simplified, and the castings made cheaper, and that it could be made in green sand.

" 58 Int. What kind of metal were you referring to?—A. Steel.

"59 Int. How long was this after Mr. Doyle's visit to East St. Louis?—Well, the next day or the day after.

" 60 Int. Was there any reference made, during that conversation, as to the mold or any part of the molds being made of anything else than green sand?—A. I don't recollect."

As Howard recollects nothing in the conversation of any reference by Doyle to any part of the molds being made of dry sand, their only proof of any explanation of that all-important feature of the invention claimed must be found in the testimony of Doyle and Gallagher.

But there is nothing in their testimony that can be accepted as furnishing sufficient proof that Doyle described this indispensable feature of the real invention in the alleged

conversations.     The burden of proof in such a contest, which lies on the party who attempts to oppose the presumptions attending the grant of the patent, is shifted only after such party has overcome the *prima facie* case of the patentee, by proof beyond a reasonable doubt.

But the statements of Doyle to Gallagher were just such as a person unacquainted with the art of casting steel might well venture to make, betraying an entire ignorance of the real difficulties of the subject.

No one but a person unacquainted with the dangers attending the casting of steel in molds containing green sand would have ventured to declare, as Gallagher says Doyle said to him : "He didn't see why steel couldn't be cast just as easy as iron ; saw no reason why he couldn't make steel lay on a mold just as easy as iron."

It is impossible to believe that if Doyle, when he had these conversations with Gallagher and Howard, had any clear or definite conception of the real principle of the invention in controversy here, he could have indulged in such incoherent and inaccurate talk.

Doyle's ignorance may be better understood in light of the undoubted proof that no such visit was made to the St. Louis Steel Foundry Works on St. Patrick's Day, 1892, notwithstanding the reiterated assertion of that date by Doyle, Gallagher and Howard.    After two witnesses for McRoberts had conclusively shown that Doyle was not at the works on that day, both he and Gallagher admitted such was the case.    Mr. Gallagher when recalled is asked by Doyle's counsel :

"41 Q. If you didn't visit the St. Louis Steel Foundry Company with Mr. Doyle on St. Patrick's Day, 1892, when was it?—A. I have become convinced that my visit over there with Mr. Doyle was on Washington's Birthday."

Doyle when recalled is asked:

" 23 Q. From the testimony of these two witnesses, have you changed your mind or opinion as to when it was that

you made that visit to the St. Louis Steel Foundry?—A. Well, if it was the 22d of February, it was a mighty fine day; and if those men have got the dates and the facts that it was not the 17th of March, they might be right; I was there in the spring of that year, certain.

"24 Q. Well, if it was not the 17th of March that you made that visit, when must it have been?—A. Well, I have got nothing more than that it was a general holiday, more especially on the east side than it was on this."

Exactly how it happened that on a general holiday (which Doyle swears was more observed on the east side than in St. Louis) the steel works on the east side should be working in full blast while the city foundries were closed, is not attempted to be explained.

In view of the entire testimony on the point and particularly of McRoberts' statement that on one occasion when they were "pouring off a heat" at the steel works he saw Doyle in the casting room looking on, it seems most probable that Doyle was there about the last of February or first of March, when McRoberts cast the ingots successfully by the new method. If this was the occasion when Doyle was present, and if he saw the casting and heard the commendations bestowed upon McRoberts by all the workmen, his statements to Gallagher in St. Louis, after his visit to the steel works, that "*they* were making a good deal of fuss about making castings *over there*," and to Howard the day after the visit that "*they* were making a great to do about what we considered a simple thing," become more intelligible, for it serves to explain why he endeavored to place the date of his conception at an earlier day than McRoberts' claim, and also why he had not comprehended the process thus put in use before his eyes without any explanation of it from McRoberts at the time; for it is evident if we are to judge from his own testimony, that when he had the alleged conversation with Gallagher and Howard he did not understand the real points involved in the invention.

In Doyle's preliminary statement he declared he made an experimental casting to test the practicability of the invention, about October 15, 1892; that about the 1st of November, 1892, he made a drawing to illustrate it and a model or pattern to carry it into practice and applied the invention to practical use, and that since that time it has been continuously used at the foundry of Shickle, Harrison & Howard. Each of these dates anticipate by fifteen days or more the time named by McRoberts when he claimed to have tested and successfully carried into practice the similar steps as to his invention.

We find these several claims on the part of Doyle are not sustained by the proofs. Doyle in his testimony admits that in the alleged tests made about October 15, 1892, the mold was a " green-sand mold with a green-sand runner," and that he tried it "to see how it would run." On his cross-examination he admits the result was a failure—of no value as a casting. Wiedmann describes the result as so complete a failure that all the metal in a collected form looked like a mouse or chicken's nest. Not a word had been said by Doyle, when examined in April, 1894, as to the use of a dry-sand gate. Mayer, one of the witnesses, after describing the failure, was asked, in August following :

"9 Q. Do you remember of Mr. Doyle making any statement about that mold, after the attempt was made to cast it?—A. He passed the remark to me that 'If I had given you a dry-sand bottom it would probable have flowed.'

"10 Q. What did he mean by dry-sand runner?—A. Gate ; dry-sand gate."

When Doyle is recalled in August, after this statement of Mayer, he is asked:

" Do you remember making any remark to Emil Mayer about a different kind of gate when it was attempted to cast the frame to which frequent reference had been made in the case, in a green-sand mold with a green-sand runner? "

[Objected to as an attempt to get this witness to swear to something he knew nothing about when last examined, in hopes of helping out the testimony of another witness, and as grossly improper after this witness has been already examined in rebuttal.]

"A. I may have said that had we a dry-sand runner, with the casting he was trying to make, that we might have something more to show in the way of a casting.

" 7. Do you remember making any such statement?"

[Objected to as grossly improper, and on further grounds last objected to in the last interrogatory.]

"A. Yes, I am satisfied that I made some such remark, for I had it in contemplation at the time of making a dry gate, and I abandoned it because I was satisfied that it would take more gate to run the thing than there would be casting."

This is rather a reluctant assent to Mayer's testimony, and is its only support.

Doyle also distinctly admits that his second attempt was made in a green-sand mold with a green-sand gate (R. 803) like the first. If he had at that time invented the idea of the dry-sand gate it is inconceivable that he would not have attempted to use it in these experiments. On the contrary, he then gave up the attempt to make the casting in steel and substituted phosphor-bronze. In the meantime, as McRoberts proved, Doyle had tried to make a steel casting in a dry-sand mold with a dry-sand gate, which also failed because of the peculiar shape of the frame; but no attempt was made to use a green-sand mold with a dry gate. Nothing could more plainly show that his original opinion that " he didn't see why steel couldn't be just as easy as iron," as announced to Gallagher still remained unchanged and these efforts to cast steel as if he were casting iron were the natural expressions of that opinion.

Doyle was asked by his counsel (R. 253): "45 Int. Had you seen steel cast in a green-sand mold with a green-sand

runner prior to that time?—A. Yes. In the year 1889 there was an experimental steel-plant over the street from our shop, that I visited some four or five times, and seen the experiments.

"46. Int. When did you see; what experiments?—A. Seen them cast steel in green sand.

Hermann testified (R. 478) that the foundry opposite the Shickle, Harrison & Howard Iron Foundry was the Dugan and Parker Malleable Iron Co., of which he was a stockholder and secretary; that it ceased to be used as a foundry in 1888, when it was converted into a warehouse and was never used afterward as a foundry; that iron was cast there, and but one experiment was ever made there to cast steel, which was a failure.

It would seem, therefore, that if Mr. Doyle saw any successful castings made at that foundry they were made of iron and not of steel.

The decided weight of the testimony upon every material point in the case is undoubtedly with McRoberts, and we have no doubt the decision below overruling Doyle's application was correct.

Since the case was submitted a supplemental brief has been filed in behalf of Doyle, in which we are asked to dismiss the case because there is no invention in the patent-right claimed.

The motion is strangely at variance with the original application and the preliminary statement of Doyle, each supported by his affidavit, in which he claims to be the inventor "of a new and useful improvement," which is the very matter claimed by McRoberts. The appositeness of the reference by McRoberts' counsel to the judgment of Solomon is very apparent, for it is the fictitious mother of this invention who desires to see it repudiated altogether, rather than allow the true inventor to obtain his just rights. It is obvious enough that the next best thing to success in

the interference case for Doyle and his fellow stockholders in the Shickle, Harrison & Howard Company would be to have the patent to McRoberts annulled, that they may be free to use that invention without payment of any royalty.

In our opinion, it is not competent for this court, in an interference proceeding, to abandon the question of priority and pass upon the patentability of the alleged invention. This was decided as far back as 1875 by the Supreme Court in General Term, *U. S. ex rel. Bigelow* v. *Thatcher*, 2 MacA. 24, where the petitioner in interference asked for the vacation of the patent upon the ground that the inventor had abandoned his invention to public uses. In *Hisey* v. *Peters*, 6 App. D. C. 70, the identical motion interposed here was made and was overruled upon the ground that the applicant was effectually estopped to dispute the patentability of the invention by reason of his own affirmative assertions that his claim was patentable. See also *U. S. ex rel. Brodie* v. *Seymour, Comr.*, 25 Wash. Law Rep. 183. But it is insisted that under the authority of *Hill* v. *Wooster*, 132 U. S. 694, the Supreme Court has settled the competency of this court to sustain this claim.

That decision has no relevancy to a case like the present.

Section 52 of the Patent Office act of July, 1870, R. S., Sec. 4915, provides that: "Whenever a patent or application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have a remedy by bill in equity, and the court having cognizance thereof, on notice to adverse parties and other due proceedings, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention as specified in his claim, as the facts in the case may appear; and such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent, etc."

It was in a proceeding under this special statute that the

Supreme Court held an equity judge was obliged under the language of the act, to consider the patentability of the invention covered by the claim, and if he should find it not patentable should deny the application. Such a provision is in entire sympathy with the general principles of equity, which refuses to decree in favor of the most specious of two applicants under a claim of an illicit character.

But the present is not a proceeding in a court of equity; nor is it an application for the issue of a patent under the circumstances recited in the statute. It s a proceeding as at law and under altogether different conditions, and hence the decision can have no application to the matter before us.

If, however, we were called upon to meet this question, we should have no hesitancy in declaring that we consider McRoberts' patent was for a useful and novel improvement, and therefore patentable; and this whether we apply the liberal definition on the subject announced fifty years ago by Justice Story in *Earl* v. *Sawyer*, 4 Mason, 51; or the limitations laid down in *Pearce* v. *Mulford*, 102 U. S. 112, and in *McClain* v. *Ortmayer*, 141 U. S. 419.

The decision of the Commissioner is *affirmed, and we will sign the appropriate orders.*